ALCIDE BERNIER, Respondent, v. PAULINE B. PRECKEL et al., Appellants.

(236 N. W. 243.)

550

Opinion filed March 21, 1931.

*A. C. Lacy,* for appellants.

*J. J. Mulready,* for respondent.

BURKE, J.   This action was heretofore before this court and re-manded for the taking of further testimony.   Bernier v. Preckel, ante, 547, 236 N. W. 242, and was again submitted and argued at the November, 1930, term of this court.   It is an action brought under § 8147, Comp. Laws 1913, to determine conflicting claims to real prop-erty.

The complaint alleges that the defendants claim certain interest in, or liens or incumbrances adverse to the plaintiff; that they and each of them are wrongfully occupying a portion of the north 11 feet of lot 3, in block 13, in Roberts' Second addition to the city of Fargo, as the same is shown on the certified plat thereof on file and of record.

The defendants deny that they are wrongfully occupying a portion of lot 3; deny that said 11 feet claimed was ever a part of lot 3, and allege that the same is a part of lot 4 and that the line dividing lots 3 and 4 was established for more than twenty years before the com-mencement of this action, and that the defendants, their ancestors and predecessors and grantors have been continuously seized and possessed thereof for more than twenty years.   There is a counterclaim for im-provements and a general and specific denial in a reply.   The trial judge made findings of fact and conclusions of law for the plaintiff and defendants appeal.

On October 23, 1880, S. G. Roberts and Jennie Roberts, his wife, filed a plat of the second addition of S. G. Roberts to the city of Fargo.

The plaintiff traces title to lot 3 back through a great number of grantors to S. G. Roberts and Jennie Roberts, his wife, owners of the Roberts' Second Addition to the city of Fargo.   His immediate grantor being Ed. C. Anderson and Lela E. Anderson, his wife, who on the 3rd day of March, 1920, executed and delivered to plaintiff a warranty deed for the south 39 feet of lot 3 in said block, and at the same time they executed and delivered to the plaintiff a quitclaim deed to the north 11 feet of lot 3 in said block.

The defendants claim title to lot 4 of said block 13, back through a

great number of grantors to S. G. Roberts and Jennie Roberts, his wife, owner of the said Roberts' Second Addition to the city of Fargo.

Mrs. Starr bought lot 1 in said block on contract in 1897, and got her deed in 1900. Mrs. Starr had her lot, lot 1, surveyed in 1902, and planted trees near the north line at the back end of the lot and they are there yet. Mrs. Starr testified that she remembered the old house that was on lot 4, and the south wing of that house was within 3 or 4 feet of the fence on the north line of lot 3, and that house was there on lot 4, as far back as Mrs. Starr could remember. During the trial Mrs. Starr went with Mr. Lacy and measured lot 1. She found the north line of the lot away north of and beyond where she planted her trees on the lot when she owned it. The lot measured 64.8 feet wide.

Mrs. Margaret Sheridan purchased and lived upon lot 3 in 1899. At that time there were houses on lots 3 and 4 and there was a fence between the two houses which was recognized as the line between the two lots.

Mrs. Charles Whitman lived in the house on lot 4 in 1898. There was a house on lot 3 at the time, and after Mrs. Sheridan purchased lot 3 in 1899, she had lot 3 filled in and graded higher than lot 4, and the wing of the house on lot 4 was within 5 or 6 feet of the grade on lot 3. Mrs. Sheridan set out trees on her lot, a couple of feet inside the grading, and the fence that was between the house on lots 3 and 4 at that time was on the line with the grade on Mrs. Sheridan's lot. Mrs. Whitman occupied the house on lot 4 until Mrs. Preckel purchased lot 4 and moved into the house in 1904.

John Moher lived in the house on lot 4 thirty years before the trial. At that time there were posts with 2 x 4s or boards nailed on top running east and west, and the south wing of lot 4 was within 5 or 6 feet of this fence. There was a barn on lot 3, the north line of the barn was about where the fence was. There was no barn on lot 4, and Moher built a shed barn up against the side of the barn on lot 3.

Mrs. Preckel was familiar with the property since 1900. She entered into a contract for a deed to lot 4 in October, 1904, and moved onto the property immediately after and lived there continuously until 1920. She got a warranty deed to the land in 1909. The little fence

between lots 3 and 4 was recognized as the dividing line between the two lots.

Mrs. Sheridan's lot at the time was graded up about 8 inches higher than lot 4, and was graded right up to the fence. Mrs. Sheridan called Mrs. Preckel's attention to a surveyor's stake which was a trifle south from the fence between lots 3 and 4, and also called her attention to trees she had planted on her lot near the fence and named after different members of her family.

Mrs. Preckel had her lot graded up to the fence on the north side and planted an elm close to the fence, which is still there. That house that was on lot 4 at that time was within 4 or 5 feet of the fence. In 1910 Mrs. Preckel moved the house back and made two houses out of it, and built two garages, both of which extend close to the line; and she built a new house on the old site but nearer the center, and not so close to the line. Mrs. Preckel does not know who built the little fence. It was old when she came there. She built a new fence in 1911, in the same place, which is still there. Mrs. Preckel was in continuous possession of all of lot 4 from 1904 until the 15th of November, 1918, when she executed and delivered to William Currie, one of the defendants, a warranty deed to the east 90 ft. of said lot 4, which deed was duly recorded in the office of the register of deeds of Cass County; and Mr. Currie immediately took possession of the said portion of lot 4, up to the dividing line where the fence is and has continuously occupied said 90 ft. of said lot 4, and was occupying it at the time of the trial.

On the 31st of July 1920, Mrs. Preckel executed and delivered to Robert P. Carney and Elsie Carney, his wife, a contract for a deed to the west 25 ft. of said lot 4; and on the 2nd day of August 1920, Mrs. Preckel executed and delivered to Ann Elizabeth Campbell, one of the defendants, a contract for a deed to the east 25 ft. of the west 50 ft. of said lot 4; and all of the defendants took immediate possession of their respective portions of said lot 4 up to the fence which defendants claim to be the dividing line between lots 3 and 4.

C. H. Lucky, a civil engineer, following the original field notes as filed with the plat, surveyed lots 1, 2, 3 and 4 of said block 13, establishing the line of said lots in accordance with the field notes on file with the plat, and in accordance with said survey lots 1, 2 and 3 are

50 ft. wide and 140 ft. long, and lot 4 is 71.15 ft. wide on the east end and 42.61 ft. on the west agreeing with the original survey. He also found that there is a fence and a hedge on the north side of lot 1 as shown on the plat, exhibit 104, which is 15.4 ft. north of the north line of 1 and from the hedge and fence to the south line of lot 1 it is 65.4 ft. There is a fence 15.9 ft. north of the north line of lot 2, running east and west. There is a fence north of the north line of lot 3 (the fence claimed to be the line between lots 3 and 4) at the west end it is 3 ft. and 3 in. north of the north line of lot 3 and on the east it is 4.6 ft. north of the north line of 3.

There was a fence on the south side of the house on lot 3 which was moved 15.9 ft. north of the north line of lot 2 as shown by the plat, exhibit 104, after the plaintiff purchased lot 3. On this plat the red line on the north side of each lot indicates the north boundary of the lot. The black lines indicate fences, now claimed to be the north boundaries of lots 1 and 2. The fence which is claimed to be the north boundary of lot 1 is 65.4 ft. from the south line, making lot 1, 65.4 ft. wide instead of 50 ft. as shown in the original plat on file, and the fence claimed to be the northern boundary of lot 2 which moved north after plaintiff purchased lot 3 is shown to be 15.9 ft. north of the north boundary of lot 2.

Mr. Stevenson also made a survey which does not agree at all with the original survey. He is asked, why he did not survey to determine the boundary lines between lots in block 13. He answered, "two reasons, one lack of time, and the second was the condition of the weather." It was impossible to get any further data on the survey.

The plaintiff admits that the fence south of the house on lot 3, which Lucky says was 50 ft. from the fence on lot 4, was moved after he purchased lot 3. It is clear from the record that the 11 ft. claimed by the plaintiff is not, and never was in the possession of the plaintiff, his ancestors, predecessors, or grantor within twenty years before the commencement of said action.

It is also clear, that the defendants, their predecessors and grantors were seized and possessed of the said 11 feet in dispute for more than twenty years before the commencement of such action. No one remembers when the original fence which was recognized as the boundary line between lots 3 and 4 was built. It was there when Mrs. Starr

purchased her lot in 1897. It was there when Moher lived in the house on lot 4, thirty years before the trial. It was an old fence when Mrs. Preckel moved into the house on lot 4 in 1904, and it remained there, recognized as the boundary between lots 3 and 4 until Mrs. Preckel tore it down and built a new fence in the same place which is still there. For more than thirty years lot 4 has been separated from lot 3 by a fence, by the grading on lot 3 and other monuments, and during all of that time, all of the 11 feet claimed by the plaintiff was north of the line fence and claimed by the defendants and their grantors under warranty deeds dating back to 1882. The defendants and their grantors have during all of the time paid the taxes on lot 4. They have three houses thereon, all occupied, have built two garages right up to the line fence, and during all of the years of the occupancy of the defendants of lot 4 no claim was ever made by any one that the 11 feet now claimed by the plaintiff was not a part of lot 4 until it was made by this plaintiff.

We are of the opinion, that the boundary line between lots 3 and 4 is established by acquiescence of the parties. 9 C. J. page 245, § 197, states the rule as follows:

"According to a number of decisions, although the presumption in favor of a boundary line acquiesced in by adjoining proprietors is strengthened by lapse of time, there is no period short of that prescribed by the statute of limitations for acquiring title by adverse possession which will render the presumption conclusive. Each case must furnish its own rule, according to its own circumstances, modifying the conclusiveness of the presumption. And some decisions have held, without qualifications, that nothing short of acquiescence for the period required by the statute of limitations for acquisition of title by adverse possession will suffice. It is very generally held, however, that where the recognition and acquiescence have continued beyond the period fixed by the statute of limitations the presumption becomes conclusive, irrespective of the correctness of the boundary acquiesced in."

"Acquiescence in a boundary line is binding on the parties and those claiming under them." Osteen v. Wynn, 131 Ga. 209, 127 Am. St. Rep. 212, 62 S. E. 37; Amber v. Cain, — Iowa, —, 110 N. W. 1053; Field v. Pascal, 2 Ky. Ops. 232; Rydalch v. Anderson, 37 Utah, 99, 107 Pac. 25. 9 C. J. 247.

A case very much in point is the case of Renwick v. Noggle, 247 Mich. 150, 225 N. W. 535:

"Defendants' land adjoined plaintiffs on the north. Practically without dispute, the testimony was that by means of an old fence on the east side, 10 to 15 rods long a fence row, hedge row, some trees, and shrubbery, a definite line between the premises was established; that for 20 to 25 'years the parties and their predecessors in title had cultivated, worked, pastured, and used their respective premises to the line so marked; that none had crossed the line, and during all those years no dispute had arisen and the neighbors had understood it was the boundary. When plaintiffs purchased, Mr. Renwick understood the fence at the east was on the line. When defendants purchased, Mr. Noggle was informed by Harris, the then owner of the Renwick premises, who purchased in 1901, that the fence, trees, shrubbery, etc., marked the line. Some three or four years ago, Cascade Road, which is the western boundary, was improved, the land abutting on it became valuable, in 1927 plaintiffs had a survey made, found that the line of occupancy was wrong, and this controversy arose. The true line is east and west, while the lines of occupancy run northeasterly from the road."

In this case the judgment for defendant was affirmed. See also Hanlon v. Ten Hove, 235 Mich. 227, 231, 46 A.L.R. 788, 209 N. W. 169, 170. To the same effect Helmick v. Davenport, R. I. & N. W. R. Co. 174 Iowa, 558, 156 N. W. 736.

"Where a landowner, adjoining a railroad's right of way, when purchasing, had the fence of the railroad company, which in fact was set over on the road's land, pointed out to her by vendor as the boundary line, thereafter going into immediate possession, she could tack her vendor's possession to her own to make up the statutory 10-year period, establishing the boundary line at the fence by acquiescence, though her deed expressly excepted the road's right of way."

In the case of Paine v. Dodds, 14 N. D. 189, 116 Am. St. Rep. 674, 103 N. W. 931, this court speaking through Judge Engerud said:

"As we held in Colonial & U. S. Mortg. Co. v. Northwest Thresher Co. 14 N. D. 147, 70 L.R.A. 814, 116 Am. St. Rep. 642, 103 N. W. 915, 8 Ann. Cas. 1160, such a cause of action accrues against the person or persons who are interested in the land adversely to the plain-

tiff's alleged right. It accrued in the first place against the then adverse parties. If the adverse rights of those persons to the property pass by contract or operation of law to other persons, the same cause of action continues, but the transferees become the persons against whom the same cause of action has accrued. The principles upon which the doctrine of 'tacking' is based are applicable in such a case, and for the same reasons, as in a case of adverse possession."

To the same effect is Nash v. Northwest Land Co. 15 N. D. 566, 108 N. W. 792.

"In order to establish a boundary by acquiescence, it is not necessary that the acquiescence should be manifested by a conventional agreement, but mutual recognition is necessary. Aside from this what constitutes an acquiescence or recognition of a boundary line depends on the words or declarations of the parties interested, on their silence, or, as is more frequently the case, on inference or presumptions from their conduct." 9 C. J. p. 246, § 198.

Section 7362, Comp. Laws 1913, reads as follows: "No action for the recovery of real property or for the recovery of the possession thereof shall be maintained, unless it appears that the plaintiff, his ancestor, predecessor or grantor was seized or possessed of the premises in question within twenty years before the commencement of such action."

This action was commenced in September 1922, and the plaintiff has wholly failed to prove either possession or seizin, actual or constructive, of any part of the 11 foot strip which he claims, as required by § 7362, Comp. Laws 1913; but on the contrary the evidence is practically undisputed that the said 11 foot strip was in the actual adverse possession of the defendants and their grantors through privity of contract for more than thirty years.

The judgment of the district court must be and is reversed, and the case is ordered dismissed with costs to the defendants.

CHRISTIANSON, Ch. J., and BIRDZELL, NUESSLE, and BURR, JJ., concur.